RAPID ELECTRIC CO., INC., ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6621-71—6623-71.   Filed November 15, 1973.

*David R. Tillinghast,* for the petitioners.
*Stanley J. Goldberg,* for the respondent.

QUEALY, *Judge:* Respondent determined the following deficiencies in these consolidated cases:

| Docket No. | Petitioners | Taxable year | Deficiency |
|---|---|---|---|
| 6621-71 | Rapid Electric Co., Inc. | 1964 | $1,597.36 |
| | ----do---- | 1965 | 1,545.99 |
| | ----do---- | 1966 | 1,090.20 |
| 6622-71 | James A. Viola | 1964 | 66,086.45 |
| | ----do---- | 1965 | 111,999.27 |
| 623-71 | James A. Viola and Evelyn Viola | 1966 | 60,993.73 |

James A. Viola, petitioner in docket No. 6622-71 and joint petitioner with his wife, Evelyn Viola, in docket No. 6623-71, is the owner of all the outstanding shares of stock of both Rapid Electric Co., Inc. (hereinafter referred to as Rapid New York), and Rapid Electric Co. of Puerto Rico, Inc. (hereinafter referred to as Rapid Puerto Rico). The principal issue for our decision is whether the extension of credit on its books by Rapid Puerto Rico to its sister corporation, Rapid New York, in the course of their business dealings in 1964, 1965, and 1966 resulted in a constructive dividend in each of such taxable years to their common shareholder, James A. Viola.

In a somewhat unrelated matter, we must also decide whether Rapid New York, petitioner in docket No. 6621-71, is entitled to deduct as compensation under section 162 [2] certain personal expenditures made on behalf of its president and sole shareholder in each of the taxable years 1964, 1965, and 1966.

---

[1] Cases of the following petitioners are consolidated herewith: James A. Viola, docket No. 6622-71, and James A. Viola and Evelyn Viola, docket No. 6623-71.

[2] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

FINDINGS OF FACT

Some of the facts have been stipulated by the parties. Such stipulation and the exhibits attached thereto are incorporated herein by this reference.

Rapid New York, petitioner in docket No. 6621-71, is a corporation organized in 1954 under the laws of the State of New York. It filed its corporate income tax returns on the accrual method of accounting for each of the taxable years 1964, 1965, and 1966 with the district director of internal revenue, Manhattan District, New York. At the time of the filing of the petition herein, Rapid New York's principal office was located at 1300 Herschell Street, Bronx, New York.

James A. Viola (hereinafter referred to as Viola), petitioner in docket No. 6622-71, timely filed his Federal individual income tax returns for the taxable years 1964 and 1965 with the district director of internal revenue, Manhattan District, New York, using the cash method of accounting, At the time of the filing of the petition herein, his legal residence was Candlewood Lake, Brookfield, Conn.

Petitioners in docket No. 6623-71 are Viola and his wife, Evelyn Viola, whom he married in 1966. They filed a timely joint Federal income tax return for the taxable year 1966 on the cash method of accounting with the district director of internal revenue, Manhattan District, New York. Their legal residence at the time of the filing of the petition herein was Candlewood Lake, Brookfield, Conn. Evelyn Viola is a petitioner herein only by virtue of having filed a joint return with her husband.

In 1944, Viola established a sole proprietorship under the name of Rapid Electric Co. to engage in the manufacture and sale of low-voltage or "electroplating" rectifiers. Rectifiers are electrical apparatus that convert alternating electrical current into direct electrical current. The rectifier operations were continued in the proprietorship form until January 1960, when its assets were transferred to Rapid New York, of which Viola was president and holder of all its outstanding stock. Since such time, Rapid New York has been continuously engaged in the manufacture and sale of rectifiers. Its plants were located in Bronx, New York, and in Brookfield, Conn., the latter being built in the late 1950's with the expectation that the entire operation could be moved there. Throughout the years in question, Rapid New York's employment level numbered approximately 150.

During 1961 and 1962, the steadily increasing competition in the manufacture of low-voltage rectifiers was adversely affecting profits. As a consequence, Viola decided to expand the operations of Rapid New York to include high-voltage or "industrial" rectifiers of the

dry type, which though considerably more complex and sophisticated to produce, provided the opportunity for a higher profit margin. This decision was not without its risks, however, since the dry type of rectifier, as opposed to the commonly used oil-immersed type, had yet to be developed by any of the other rectifier manufacturers. The Brookfield, Conn., plant was chosen as the place to begin the operation since the facilities were better suited for the job.

At the outset, Rapid New York encountered unexpected difficulties in perfecting the industrial rectifier. It also found itself faced with a sudden labor shortage in Brookfield which resulted in labor costs being 20 percent to 30 percent higher than those in the Bronx. The shortage prevented Rapid New York from consolidating its whole operation in Brookfield as originally planned. As a consequence, it had to operate two plants with a costly duplication of equipment and overhead. A combination of all these factors placed severe financial strain on the corporation. Such conditions continued to exist during the years in question, 1964 through 1966.

On January 31, 1961, Viola formed Rapid Puerto Rico under the laws of Puerto Rico. He has been the owner of all its outstanding stock and its president since its inception. At all times pertinent herein, Rapid Puerto Rico has been engaged in the manufacture and sale of metal containers or cabinets which are used to house both low- and high-voltage rectifiers. The purpose in forming Rapid Puerto Rico was to provide Rapid New York with an assured and dependable supply of containers for its rectifiers. Prior to the creation of Rapid Puerto Rico, Rapid New York had experienced considerable difficulty in obtaining prompt delivery of containers from independent suppliers. Much of this difficulty was attributable to the inability of Rapid New York to make timely payments to the suppliers which, in turn, was caused by its tenuous financial condition during this period.

The decision by Viola to locate its supplier in Puerto Rico was based on the greater profit potential afforded by labor costs which were 50 percent lower than in the United States, and the added incentives offered by the Puerto Rican Government, which included 18 months free rent for its operations, and the funds necessary to train the personnel and to ship the manufacturing equipment to Puerto Rico from the United States. In return for the commitments by the Puerto Rican Government, Rapid Puerto Rico agreed to hire 15 local employees at its inception and reach a level of 21 within 2 years.

Beginning in 1962, Rapid Puerto Rico supplied all the needs of Rapid New York with respect to metal containers.[3] The procedure

---

[3] Respondent has conceded since the prices charged for the containers were reasonable there is no basis for an adjustment under sec. 482.

agreed upon by the two corporations for accounting for such sales was that Rapid Puerto Rico would set up an accounts receivable on its books for all amounts owed by Rapid New York by reason of such sales, against which would be credited any amounts expended by Rapid New York in purchasing raw materials on its behalf and any cash payments made against the account. A corresponding accounts payable was set up on the books of Rapid New York. This procedure was followed throughout the years in question.

As of January 1, 1964, the opening balance due Rapid Puerto Rico from Rapid New York was $184,840.08. The following indicates the net increases to such account in each of the years in question:

### 1964

| | | |
|---|---:|---:|
| Sales from Rapid Puerto Rico to Rapid New York | | $182, 625, 06 |
| Less: | | |
| Raw materials purchased by Rapid New York for the account of Rapid Puerto Rico | $74, 692. 50 | |
| Cash payments from Rapid New York to Rapid Puerto Rico | 17, 500. 00 | |
| Total repayments | | 92, 192. 50 |
| Net increase in the account | | 90, 432. 56 |

### 1965

| | | |
|---|---:|---:|
| Sales from Rapid Puerto Rico to Rapid New York | | $265, 095, 79 |
| Less: | | |
| Raw materials purchased by Rapid New York for the account of Rapid Puerto Rico | $77, 346. 39 | |
| Cash payments from Rapid New York to Rapid Puerto Rico | 24, 434. 85 | |
| Total repayments | | 101, 781. 24 |
| Net increase in the account | | 163, 314, 55 |

### 1966

| | | |
|---|---:|---:|
| Sales from Rapid Puerto Rico to Rapid New York | | $311, 308. 97 |
| Less: | | |
| Raw materials purchased by Rapid New York for the account of Rapid Puerto Rico | $96, 581. 55 | |
| Cash payments from Rapid New York to Rapid Puerto Rico | 111, 500. 00 | |
| Total repayments | | 208, 081, 55 |
| Net increase in the account | | 103, 227, 42 |

The closing balance of the accounts receivable of Rapid Puerto Rico at the end of 1966 was $541,814.61. Rapid New York made its purchases of raw materials several times each year at the request of Rapid Puerto Rico. The raw materials were shipped directly down to Rapid Puerto Rico and used in its business. It periodically made cash payments whenever it could spare the money without jeopardizing its business and financial position. The payments did not correspond to any particular invoice or invoices received from Rapid Puerto Rico.

Rapid New York had a taxable income of $18,113.94, $25,812.94, and $48,658.72, respectively, during the years 1964 through 1966. Its balance sheets for the end of such years reflected as current assets and current liabilities, the following:

| | 1964 | 1965 | 1966 |
|---|---|---|---|
| *Current assets* | | | |
| Cash account | $22,289.39 | $16,412.82 | $74,722.70 |
| Net accounts receivable | 352,810.19 | 487,671.87 | 526,812.60 |
| Inventory account | 375,172.00 | 440,475.00 | 558,990.00 |
| Investment in Government obligations | 1,500.00 | 1,500.00 | 1,500.00 |
| Total | 751,771.58 | 946,059.69 | 1,162,025.30 |
| *Current liabilities* | | | |
| Accounts payable | 624,731.77 | 791,252.50 | 1,018,933.87 |
| Mortgages, notes, and bonds payable in less than 1 year | 26,916.00 | 30,476.00 | |
| Other current liabilities | 35,405.31 | 44,297.96 | 44,340.25 |
| Total | 687,053.08 | 866,026.46 | 1,063,274.12 |

Rapid New York did not issue any notes or similar instruments of indebtedness to Rapid Puerto Rico with respect to any of the above balances owing. The additional working capital which became available to Rapid New York during such years as a result of Rapid Puerto Rico's extension of credit on its sales was principally used to build up its inventory. No portion of such additional working capital, however, nor any of its regular working capital, its assets, or the profits realized from its operations was used or disposed of in a way which was not related to its trade or business.[4]

Rapid Puerto Rico continued to sell containers to Rapid New York on the same basis in the years 1967 through 1969. The total sales for such years amounted to $273,817.29, $248,107.58, and $206,399.84, respectively, while the respective cash payments and purchases of raw materials for such years totaled $196,235.49, $194,684.94, and $137,-993.09. As of the end of 1969, its accounts receivable balance was $741,225.80.

Rapid New York's purchases of containers from Rapid Puerto Rico accounted for 64 percent of its total sales in 1964 and 92 percent and 90 percent of its total sales respectively in 1965 and 1966.

[4] One incidental exception to this was bona fide loans of $8,602.37 and $235.78, made to Viola in 1964 and 1966, respectively.

A certain part of purchases in 1965 and 1966 included amounts representing shipments of surplus containers which Rapid Puerto Rico held during each of those years.[5] Rapid Puerto Rico treated these surplus shipments as sales on its books.

The manufacture of surplus containers by Rapid Puerto Rico was necessary to meet its commitment to the Puerto Rican Government to maintain an employment level of at least 15 workers. The commitment was originally made in the expectation that a viable independent market for its containers could be established in the Caribbean. Its subsequent failure to develop such an outside market by 1965 created a situation where production capacity exceeded the demand.[6] Nevertheless, in order to keep its employment commitment, it had to continue to make containers whether Rapid New York needed them or not. Its attempts to get the Puerto Rican Government to release it from its employment commitment were met only with demands that the incentives which it originally received be restored.

Rapid Puerto Rico had accumulated earnings and profits of $149,894.06 as of January 1, 1964, and had current profits of $127,626.85, $110,844.92, and $171,986.79, respectively, during the taxable years 1964 through 1966.

Neither Rapid New York nor Rapid Puerto Rico has paid a dividend since its inception.

Respondent asserted deficiencies against Viola in 1964 and 1965 and against Viola and his wife in 1966 contending that the net increases in the accounts receivable of Rapid Puerto Rico for each of such years represented constructive dividends to Viola.

During the taxable years 1964–66, Viola incurred the following travel and entertainment expenses:

|  | 1964 | 1965 | 1966 |
|---|---|---|---|
| Cash | $3,060 | $800 | $2,300 |
| Airlines—Puerto Rico | 986 | 1,221 | 608 |
| Hotels—Puerto Rico | 1,462 | 869 | 691 |
| Total | 5,508 | 2,890 | 3,599 |

Rapid New York reimbursed Viola for the amounts so expended and claimed such amounts as deductions on its corporate returns for the years 1964 through 1966. It also claimed a deduction of $500 in each of such years as the cost of operating an automobile used by Viola. Respondent has disallowed all such claimed deductions except for $3 of travel and entertainment expense in 1964.

---

[5] It was estimated by Viola that Rapid New York had a surplus of $150,000 of cabinets on hand at the end of 1966.

[6] One of its largest potential customers, ITT Caribbean, discovered it could not use the containers as produced, but needed higher quality containers for its telephone equipment.

Viola has conceded that all such disallowed amounts are includable in his income. Viola has not, however, conceded that such amounts should be characterized as dividends to him. Rapid New York is seeking to deduct such amounts on the basis that they represent additional compensation to Viola. Viola's compensation as president of Rapid New York during the years 1964 through 1966, excluding the amounts in issue, was $22,260, $36,154, and $37,332, respectively.

OPINION

The first question for our decision is whether the extension of credit on its books by Rapid Puerto Rico to its sister corporation, Rapid New York, in the course of their business dealings in 1964, 1965, and 1966, constitutes a constructive dividend in each of such years to their common sole shareholder.

During the years in question, Rapid New York was in the business of manufacturing and selling rectifiers, which are electrical apparatus used to convert alternating electrical current into direct electrical current. Its brother corporation, Rapid Puerto Rico, was responsible for supplying all its requirements for metal containers which were used to house the rectifiers. In accordance with a procedure agreed to by both sides, Rapid Puerto Rico set up an accounts receivable on its books for all sales of metal containers it made to Rapid New York during each of the years 1964 through 1966, against which it would credit any cash payments made by Rapid New York and any amounts expended by Rapid New York to purchase raw materials on its behalf. A corresponding accounts payable was set up on the books of Rapid New York. In each of the years in question, there was a net balance in the accounts receivable. Rapid Puerto Rico decided not to force collection on any of such balances owing since Rapid New York was under serious financial pressures throughout this period and was already making whatever cash payments it could spare without jeopardizing its business. Instead, it extended a line of credit on all such amounts.

Respondent contends that the net increases in the accounts receivable of Rapid Puerto Rico in each of the years in question constitute a constructive dividend to Viola. Although respondent does not question the bona fide nature of the obligation when initially reflected on Rapid Puerto Rico's books, he argues that the net increases in the accounts receivable became the equivalent of equity advances over the passage of time as a result of Rapid Puerto Rico's failure to collect thereon.[7]

_____

[7] The customary time for collection on its invoices in sales to unrelated parties was 90 to 120 days.

Respondent contends that Viola, as sole shareholder of both corporations, had unfettered control over both the timing and the amount of these so-called equity advances. As respondent views this arrangement, Viola's control over the net increases in the accounts receivable is substantially equivalent to having received a dividend from Rapid Puerto Rico to the extent of such increases and a capital reinvestment by him of such amounts in Rapid New York.

Respondent has not raised the issue of thin capitalization. Moreover, he also concedes that there is no basis for the application of section 482 since the sales prices of the containers sold by Rapid Puerto Rico to Rapid New York were reasonable in amount.

It is well established that distribution by a corporation can be treated as a dividend to its shareholder if it is made for his personal benefit or in discharge of his personal obligations. This is so in spite of the fact that the funds are not distributed directly to him. *Walter K. Dean*, 57 T.C. 32 (1971) ; *Edgar S. Idol*, 38 T.C. 444 (1962), affd. 319 F. 2d 647 (C.A. 8, 1963) ; *Challenge Manufacturing Co.*, 37 T.C. 650 (1962).

The transfer of funds between related corporations will also constitute a dividend to the sole shareholder if it was made primarily for his benefit and if he received a direct or tangible benefit therefrom. *W. B. Rushing*, 52 T.C. 888 (1969), affirmed on other grounds 441 F. 2d 593 (C.A. 5, 1971) ; *Sammons v. Commissioner*, 472 F. 2d 449 (C.A. 5, 1972), affirming, reversing, and remanding a Memorandum Opinion of this Court. The mere fact, however, that an individual as sole shareholder might derive some indirect or incidental benefit from the transfer will not be sufficient to give rise to a constructive dividend. *W. B. Rushing, supra.*

Although no cash was ever transferred between Rapid Puerto Rico and Rapid New York, the extension of credit may be treated as the equivalent thereof since its effect, which was to give Rapid New York increased working capital, is similar in substance to a cash advance.

Looking to the facts in our case, we find that the advances of credit in each of the years in question were neither made primarily for the benefit of Viola nor resulted in his receiving any direct benefit therefrom.

Rapid New York was the dominant and principal customer of Rapid Puerto Rico as reflected by the fact that its purchases of metal containers accounted for 64 percent, 92 percent, and 90 percent, respectively, of Rapid Puerto Rico's total sales during the years 1964 through 1966. Rapid Puerto Rico was thus almost wholly dependent on Rapid New York for the sales of its metal containers. Either Rapid Puerto Rico or Rapid New York had to carry the surplus inventory of

containers which were manufactured in order that Rapid Puerto Rico might meet its employment commitment to the Puerto Rican Government. For all practical purposes, because of the common ownership of both corporations, it was immaterial which carried the surplus.

Throughout this time, Rapid New York was experiencing financial difficulties as a result of increased competition in its sale of low-voltage rectifiers and its attempted expansion of its product line to include high-voltage rectifiers. Rapid New York made payments on the balances owing to Rapid Puerto Rico both in cash and in the form of raw materials purchased for the account of Rapid Puerto Rico to the fullest extent possible. Rapid New York was also faced with the necessity of carrying increased accounts receivable and inventories if the business of both corporations was to survive. The circumstances which necessitated the extension of credit by Rapid Puerto Rico to Rapid New York clearly negates any inference that such action was taken for the benefit of Viola. Cf. *Sparks Nugget, Inc.* v. *Commissioner*, 458 F. 2d 631 (C.A. 9, 1972) ; *Equitable Publishing Co.* v. *Commissioner*, 356 F. 2d 514 (C.A. 3, 1966), affirming a Memorandum Opinion of this Court, certiorari denied 385 U.S. 822 (1966). Any benefit which may have accrued to Viola as a result of the extension of credit was merely derivative in nature and insufficient to justify the inference of a taxable dividend. *W. B. Rushing, supra.*

Whether we classify the extension of credit as debt or as some other kind of investment, the working capital which was provided to Rapid New York by Rapid Puerto Rico remained in the corporate solution throughout the years in question. There is no indication that any of it was siphoned off to or for the benefit of Viola. Cf. *Sparks Nugget, Inc., supra; Equitable Publishing Co.* v. *Commissioner, supra; Worcester* v. *Commissioner*, 370 F. 2d 713 (C.A. 1, 1966) ; *George R. Tollefsen*, 52 T.C. 671 (1969), affd. 431 F. 2d 511 (C.A. 2, 1970). Moreover, we find no basis for disregarding Rapid New York as a viable taxable entity separate and apart from its sole shareholder, Viola. What we have here is merely the reverse of the more commonplace situation where the manufacturer "carries" its supplier through financial difficulties with no direct benefit accruing to the supplier's shareholders.

Respondent contends that this arrangement is a tax-avoidance device which allows Viola to make transfers of earnings from Rapid Puerto Rico, which is exempt from United States tax, to Rapid New York under the guise of a commercial transaction instead of a dividend. The fact that Congress enacted section 956 with such a device in mind and exempted Puerto Rican corporations like Rapid Puerto Rico from its provisions by way of section 957(c) is a clear indication of its intent in this matter. See Hearings before House Committee on Ways and Means on President's Recommendations on Tax Revision, 87th Cong., 1st Sess., vol. 4B, pp. 3534, 3549–3551 (1961). In accord-

ance with the above, we find no basis for concluding that a taxable dividend is chargeable to Viola on account of the intercorporate advances.

The remaining issue for decision involves the deductibility by Rapid New York of certain travel and entertainment expenses and certain automobile expenses it incurred on behalf of Viola in each of the taxable years 1964 through 1966.

Viola incurred travel and entertainment expenses of $5,508, $2,890, and $3,599, respectively, in the years 1964 through 1966. Rapid New York reimbursed Viola for the amounts so expended and claimed such amounts as deductions on its corporate returns in each of these years. It also claimed a deduction of $500 in each of such years as the cost of operating an automobile used by Viola. Respondent has disallowed all such claimed deductions except for $3 of travel and entertainment expense incurred in 1964 which consequently is not now in issue.

Respondent has characterized these amounts as being constructive dividends to Viola and therefore nondeductible to Rapid New York. Viola has conceded that the contested amounts were income to him in each of the years in question. However, Rapid New York maintains it is entitled to deduct such amounts under section 162 as additional compensation. There is nothing in the record to indicate that Rapid New York intended such benefits to be compensation to Viola. See *Challenge Manufacturing Co.*, 37 T.C. 650 (1962). Accordingly, we are compelled to sustain the determination of the respondent for each of the years in issue.

> *Decisions will be entered under Rule 50 in docket Nos. 6622-71 and 6623-71.*
> *Decision will be entered for the respondent in docket No. 6621-71.*