ROBERT TRENT JONES and IONE DAVIS JONES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jones v. Commissioner
Docket No. 384-73
United States Tax Court
T.C. Memo 1975-101; 1975 Tax Ct. Memo LEXIS 272; 34 T.C.M. (CCH) 488; T.C.M. (RIA) 750101; April 14, 1975, Filed. Martin D. Cohen, for the petitioners. William M. Gross, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: The respondent determined a deficiency of $12,874.25 in the federal income taxes of the petitioners for the calendar year 1968. Certain issues not having been raised in the petition, the sole issue for decision is whether petitioner Robert Trent Jones constructively received *273 a dividend in the amount of $22,075 from International Planners Limited in 1968. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners Robert Trent Jones and Ione Davis Jones are husband and wife who, at the time of the filing of the petition herein, maintained their legal residence in Montclair, New Jersey. They filed their joint federal income tax return for the calendar year 1968 with the district director of internal revenue at Newark, New Jersey. Ione Davis Jones is a party to this action solely by virtue of having joined in the filing of a joint return and consequently Robert Trent Jones will hereinafter be referred to as the petitioner. International Planners Limited (hereinafter Planners) is a corporation organized on December 22, 1966 under the laws of the Bahamas. Intercontinental Contractors Limited (hereinafter Contractors) is a corporation organized on April 25, 1968 under the laws of the Bahamas. Both corporations are whooly-owned by petitioner, maintain their books and records using the cash basis of accounting, have *274 adopted calendar year accounting periods, are not subject to United States income tax for the taxable year 1968, and have not at any time material hereto declared dividends. Petitioner is an internationally known designer of golf courses. Robert Trent Jones, Inc. is the corporation through which petitioner conducts his business in the United States. Planners is the corporation through which petitioner conducts his business of planning and designing golf courses outside the United States. Planners is classified as a "nonresident" [1] for Bahamian exchange control purposes. Planners' status as a nonresident indicates that its business is conducted outside (however, limited trade with residents of the Sterling Area is apparently permitted [2]) the Sterling Area which includes the Bahamas and England. Nonresident status also imposes the requirement of permission of the customer's (resident's) exchange control authority before a customer within the Sterling Area may remit external sterling (which is then freely converted to foreign currency or non-sterling currencies) to a nonresident company. Contractors is classified as a "resident" for Bahamian exchange control purposes. This status *275 indicates that Contractors' business is conducted within the Sterling Area and allows it to receive any type of funds (currency) but all receipts immediately become resident currency which, if not already sterling, must be converted into sterling currency in the absence of specific exchange control permission to the contrary. After learning that its then present golf course had been condemned, The Moor Allerton Golf Club Limited, (hereinafter Moor Allerton) located near Leeds, England, desired to build a new course on land it had purchased for that purpose. Moor Allerton sought a package deal for its new golf course which included design, construction and supervision of construction. Consequently, in order to obtain the job, it was necessary for petitioner *276 to provide or arrange for the construction of the golf course, a function Planners did not previously perform. During negotiations between Planners and Moor Allerton it was learned that Moor Allerton could not, contrary to the desire of petitioner, pay for the cost of the golf course in U.S. dollars but could only pay in blocked sterling (i.e., Moor Allerton could not obtain permission from its exchange control authority to pay in U.S. dollars). Contractors was then created in order to handle the construction end of the job and to allow a resident company to receive the blocked sterling (with the hope of eventually being able to convert the blocked sterling into U.S. dollars and/or using the blocked sterling in future ventures within the Sterling Area). On August 12, 1968, Planners and Contractors executed a contract for the design and construction of a golf course in England for Moor Allerton for 115,500 pounds sterling (about $240,000 at that time). This contract stated that Contractors agreed to design (with the understanding that Contractors had caused Planners to design the course which Planners had already done) and construct a golf course and that both Contractors and Planners *277 agreed to insure that the design and construction would be supervised by, among others, petitioner who was president of both corporations. This contract called for all payment thereunder to be made to Contractors and for partial payments to be made as work on the course progressed. No written agreement between Planners and Contractors was executed concerning any amount or time Planners was to be paid as a result of its part in the Moor Allerton contract. However, petitioner understood that the amount of Planners' fee would be the normal 10 percent of the contract price. Construction of the golf course began in August, 1968. Contractors built the golf course, employing subcontractors who performed all of the actual construction work. Planners designed the golf course and supervised the work done by the subcontractors. Contractors has engaged in no business activity other than the Moor Allerton contract, although other work within the Sterling Area has been sought. All payments due under the Moor Allerton contract were made to Contractors in accordance with the terms of said contract and no part of the proceeds was paid over to Planners. There was no transfer of funds or other *278 assets, or delivery of notes or other debt instruments (other than an invoice referred to hereafter), directly or indirectly, from either corporation to the other or to the petitioner as a result of the Moor Allerton contract. In approximately June 1969, petitioner consulted with Paul A. Colwell, Jr. (hereinafter Colwell), a legal advisor and business manager with Robert Trent Jones, Inc., and advised him that work on the Moor Allerton course had progressed to the point where it was timely for a payment to be made by Contractors to Planners for the design and supervisory work the latter had done on the Moor Allerton course. A fee of $24,000, standard in the industry for the services performed, was then decided upon. Colwell, aware of the currency exchange problems between nonresident and resident Bahamian companies, wrote on June 6, 1969, to an attorney in Nassau in order to determine how to obtain Bahamian exchange control permission to make payment of the $24,000. Colwell was informed by the Nassau attorney that it would be next to impossible to obtain the desired approval. Petitioner then attempted to effect payment to Planners through England. In September, 1969 $24B,000 was *279 transferred from Contractors' bank in the Bahamas to its bank in England and an invoice for $24,000 for services rendered on the Moor Allerton course was sent from Planners to Contractors. However, again approval for exchange of the money could not be obtained. At that point, petitioner let the matter rest with Contractors retaining the money it transferred to its account in England. Neither Planners' nor Contractors' 1968 financial statements, attached to petitioner's 1968 income tax return, showed any receivables or payables, respectively, from or to each other on account of the Moor Allerton contract. However, such reports were prepared on the cash basis of accounting and thus reflect no accruals. As of the end of 1968, petitioner's equity investment in Contractors was $5, as was his equity investment in Planners. Contractors' balance sheets for 1968 and 1969 showed capital surpluses of $91,983 and $42,690, respectively. In his notice of deficiency, the respondent determined that petitioner constructively received a dividend from Planners in the amount of $22,075 [3] in the year 1968. *280 OPINION The sole issue presented requires our determination of whether the performance of services by Planners, pursuant to a contract for the design and construction of a golf course jointly executed by Planners, its sister corporation Contractors and Moor Allerton under which all payments made by Moor Allerton were to be made to Contractors, constitutes a constructive dividend to petitioner, the sole stockholder of both Planners and Contractors, where no payments were ever made by Contractors to Planners for the latter's services rendered under the aforementioned contract. It is well settled that a distribution [4] by a corporation, although not made directly to a stockholder, may be treated as a dividend if it is made for the personal benefit of the stockholder or in discharge of a personal obligation of the stockholder. Walter K. Dean,57 T.C. 32, 40 (1971); W.B. Rushing,52 T.C. 888, 893 (1969), affirmed without discussion of this issue 441 F. 2d 593 (5th Cir. 1971). If property is transferred from one corporation to a sister corporation *281 such transfer may constitute a constructive dividend to the common sole stockholder if it is found that the transfer was made primarily for the benefit of the stockholder. James Kuper,61 T.C. 624, 632 (1974), on appeal (5th Cir. Aug. 1974); Ross Glove Co.,60 T.C. 569, 595 (1973). However, constructive dividend treatment does not ensue solely because one person is the only stockholder of the transferor and transferee corporations. Joseph Lupowitz Sons, Inc. v. Commissioner,497 F. 2d 862, 868 (3d Cir. 1974), affirming on this issue T.C. Memo. 1972-238. The mere fact that a sole stockholder may derive some indirect or derivative benefit from the transfer is not a sufficient basis upon which to find a constructive dividend. Rapid Electric Co.,61 T.C. 232, 239 (1973); W.B. Rushing,supra at 894. *282 We do not believe that the facts of the instant case show a transfer made primarily for the benefit of petitioner. Although Planners did perform services for which it was never paid and for which Contractors was paid, any benefit received by petitioner was only indirect in nature. The funds retained by Contractors were not personally used by petitioner, nor were they expended for his personal benefit or in discharge of his personal obligation. Respondent argues, however, that the funds retained by Contractors relieved petitioner of the obligation of financing Contractors' operations through the use of his own personal funds. Respondent's argument here is based on the fact that Contractors' contributed capital was only $5. Such argument is untenable when the facts of the instant case are considered. To sustain respondent's position that petitioner's relief from providing working capital to Contractors from his own funds causes the inclusion of a constructive dividend in his 1968 income, we think at least two implicit requirements must be satisfied. These are the knowledge in or belief of petitioner, at the time of executing the Moor Allerton contract, (1) that Contractors would *283 have a loss on the contract which would require the use of petitioner's personal funds to complete the project and (2) that Contractors would be unable to effect payment to Planners for services rendered because of exchange control restrictions. From the record in this case we cannot find either of these two necessary ingredients to be facts. At the end of 1968 Contractors had a $91,983 surplus, and while it lost money in 1968, its surplus was still substantial enough to pay Planners' fee of $24,000. Such facts, in addition to petitioner's professed profit motive in his business transactions, convince us that petitioner expected to make a profit on the Moor Allerton contract. Furthermore, we do not believe petitioner's capital contribution to Contractors to be necessarily too small to allow it to survive without additional financing by petitioner since it appears from Planners' 1968 balance sheet that it too was funded by petitioner with only $5 capital. We think that Contractors (as probably did Planners) entered into a contract which, through progress payments, would provide its own working capital. While petitioner did know in August 1968 that, because of exchange control restrictions, *284 Moor Allerton could pay for the golf course only in blocked sterling, we can find nothing in the record which indicates to us that petitioner knew or even believed in August 1968 that Contractors would be unable, because of exchange control restrictions, to effect payment to Planners for services rendered. On the other hand, we think Planners had a valid business reason for entering into the contract even though all payments thereunder were to be made to Contractors. Planners was a nonresident company for Bahamian exchange control purposes. Thus is could not receive and use blocked sterling. When it was learned that Moor Allerton could only pay for the golf course in blocked sterling, Contractors was organized as a resident company for Bahamian exchange control purposes, thus enabling it to receive and use (although it could not exchange into U.S. dollars and pay such to nonresident companies without exchange control permission) blocked sterling. Thus Planners was able to participate in and profit by the Moor Allerton job. In addition to the above reason, prior to the Moor Allerton contract, Planners did not perform or arrange for construction of the golf courses it designed. Moor *285 Allerton insisted on a package deal covering both design and construction of the golf course. Under the Moor Allerton contract the construction function was handled by Contractors and Planners was consequently able to participate in the job. Therefore we cannot say that petitioner was primarily benefited in a manner to require the inclusion in his income of a constructive dividend from Planners by reason of the latter's participation in the project. Moreover, we are of the opinion that a valid obligation, arising from Planners' rendering of services and running from Contractors to Planners, was intended and did in fact exist. We note here that it has not been argued by respondent, and properly so we think, that either corporation was not a viable entity for tax purposes. Although, admittedly, petitioner conducted the business between Contractors and Planners in an informal manner (as, unfortunately for the trier of fact, sole stockholders are wont to do), we think the validity of the obligation was evidenced by petitioner's attempts from June through September 1969 to effect payment from Contractors to Planners. While respondent suggests such attempts were merely window dressing, *286 we think petitioner's and Colwell's testimony (supported by the documentary evidence presented) on the subject was credible especially in light of the fact that it was not until 1970 that petitioner's 1968 return was audited. We think it also important that the fee ($24,000) petitioner sought to have Contractors pay Planners was standard in the industry. Thus we find the instant case to be distinguishable from those cases such as Sammons v. United States,433 F. 2d 728 (5th Cir. 1970); Sparks Nugget, Inc. v. Commissioner,458 F. 2d 631 (9th Cir. 1972) affirming T.C. Memo. 1970-74, certiorari denied, sub nom. Graves v. Commissioner,410 U.S. 928 (1973); Worcester v. Commissioner, 370 F. 2d 713 (1st Cir. 1966), aff'gT.C. Memo. 1965-199;Equitable Publishing Co. v. Commissioner,356 F. 2d 514 (3d Cir. 1966), affirming per curiam T.C. Memo. 1965-131, certiorari denied 385 U.S. 822 (1966), involving excessive payments for services or property by one related corporation to another, where it can be said, unlike here, that the stockholders of the recipient *287 or transferee corporation received a tangible benefit. Joseph Lupowitz Sons, Inc. v. Commissioner,supra at 868. Decision will be entered for the petitioners.
Footnotes
1. The parties provided the Court with an agreed-upon summary of the rules regarding nonresident and resident statuses with respect to exchange control under Bachamian law. ↩
2. It appears that in 1968 Planners entered into a contract with the government of Bermuda (within the Sterling Area) for the design of a golf course, but, apparently due to the influence of the Bermudian government, payment was made in U.S. dollars.↩
3. This amount is apparently what respondent thought Planners' services were worth.↩
4. Sec. 301 provides that a distribution of property by a corporation to a stockholder with respect to its stock is, to the extent that the distribution constitutes a dividend as defined by sec. 316, includible in the recipient stockholder's gross income. Sec. 317(a) defines "property" as money, securities, and any other property. Whether the distribution herein involved is considered to be the rendering of service or the diversion of income or funds, we think such distributions are covered by the sec. 317↩ definition of property.