GEORGE H. CARTER, JR. and OLGA S. CARTER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Carter v. Commissioner
Docket No. 3780-76.
United States Tax Court
T.C. Memo 1977-322; 1977 Tax Ct. Memo LEXIS 115; 36 T.C.M. (CCH) 1295; T.C.M. (RIA) 770322; September 21, 1977, Filed Charles L. Steel, IV, for the petitioners. Frank D. Armstrong, Jr., for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' joint Federal income taxes and additions to tax under section 6653(a)[1] for 1972 and 1973: Additions Year
Deficiency
To Tax
1972
$45,287.44
$2,264.37
1973
5,212.88
260.64
With respect to 1973, a previously assessed section 6651(a)(1) delinquency penalty of $34 was abated and netted against the addition to tax, leaving a determined liability of $226.64. The issues for decision are: (1) Whether payments made in 1972 and 1973, of *117 $40,000 and $15,000, respectively, by Durham Ready Mixed Concrete Supply Company, Inc. (hereinafter Durham) to Southern Mobile Concrete Company (hereinafter Southern) constituted constructive dividends to the petitioners under sections 301 and 316. (2) Whether any part of the underpayments for 1972 and 1973 was due to negligence or intentional disregard of the rules and regulations within the meaning of section 6653(a). (3) Whether Olga S. Carter is entitled under section 6013(e) to relief from liability for tax for 1972 and 1973 as an "innocent spouse." FINDINGS OF FACT At the time their petition was filed, petitioners George H. Carter, Jr. and Olga S. Carter were legal residents of Durham, North Carolina. Petitioners filed their joint Federal income tax returns for 1972 and 1973 with the Internal Revenue Service Center, Memphis, Tennessee. Petitioner George H. Carter, Jr. (Carter) has been engaged in the preparation and sale of ready-mixed concrete in and around Durham, North Carolina since 1952. On December 5, 1955, petitioners and Carter's aunt, as the principal shareholders, formed Durham, a North Carolina corporation, to carry on the business. Carter was at all *118 relevant times the president of the company. As of August 1972, the ownership of the 420 shares of voting common stock of Durham originally issued and outstanding was as follows: Name
Number of Shares
George H. Carter, Jr.
220
Louise L. Carter, aunt of
George H. Carter, Jr.
100
Olga S. Carter, wife of
George H. Carter, Jr.
30
Albert D. Harris
20
L. G. Martin
20
M. M. Fowler, Inc.
10
Central Insurers, Inc.
10
Charles S. Allen, Jr.
5
Helen Allen Harris
5
420 During August and September of 1972, the company redeemed the unrelated, non-Carter family members' shares so that as of November 30, 1972, the outstanding common stock was held as follows: Name
Number of Shares
George H. Carter, Jr.
220
Louise L. Carter
100
Olga S. Carter
30
350
Durham's principal business activity was the preparation and sale of ready-mixed concrete. It originally operated an exclusively fixed-base ready mixed concrete sales business. In 1959, it set up a mobile concrete plant at Oregon Inlet, North Carolina, to furnish concrete to a large construction project being carried out by Carolina Power and Light Company, a North Carolina based public *119 utility. The mobile operation was initially very profitable. Durham's fixed-base operation continued to be generally profitable until late 1969 when the general construction business began to deteriorate. Due to this general decline in the construction business and the entry into its market of a large competitor, D. R. Allen and Sons, Durham sustained operating losses during 1970 and 1971. The taxable income (loss) of Durham for the fiscal years ended November 30, 1969, through November 30, 1973, was as follows: November 30, 1969
$31,297.96
November 30, 1970
(86,772.16)
November 30, 1971
(25,624.53)
November 30, 1972
63,118.98
November 30, 1973
5,783.26 Durham's taxable income for the year ended November 30, 1972, for the most part resulted from the $274,995.41 gain reported from the sale of its assets. It had only $10,269.76 gross profit from sales in the normal course of its business. The fixed-base operations of Durham were greatly curtailed in 1970 and were virtually shut down in 1971. During this period, Carter had decided to discontinue the fixed-base operation and to enter into what he believed to be the more lucrative business of mixing and *120 supplying concrete to large construction projects through mobile or portable facilities. Durham's financial position became precarious. Carter was personally involved in attempting to keep creditors from foreclosing on Durham's property and at the same time attempting to find a buyer for its assets. Durham's income tax return for the fiscal year ended November 30, 1972, shows that Carter was paid a salary of $2,400 for the year. On November 13, 1970, Southern, a North Carolina corporation, was formed in furtherance of Carter's plan to enter into the business of furnishing ready-mixed concrete to large construction projects. Carter, James C. Hutchins, and David M. McConnell were each issued stock certificates representing ownership of 100 shares of voting common stock in the new corporation. James C. Hutchins was nominee for William Paul Hutchins to whom the stock was transferred on August 1, 1973. On June 5, 1974, these shares were transferred to Carter. As in the case of Durham, Carter was Southern's president throughout the company's existence. Olga S. Carter was its secretary. In her position as corporation secretary she was required only to sign the stock certificates. *121 This she did in her home. She was not aware of any of the transactions between Southern and Durham. She had no business contacts with Durham. Most of Durham's former stenographic and clerical personnel and mechanics, as well as other employees, transferred from Durham to Southern. These employees while working for Southern occasionally worked on Durham's business matters and repaired its trucks. Notwithstanding the fact that the common stock certificates issued to Southern's shareholders reflect that the subscription price was fully paid, the shareholders did not make any initial capital contributions to the corporation. David McConnell put up $60,000 in an escrow type account. Under the terms of the agreement, however, the money could not be used by Southern without his consent. Thus, at the time the company began operations, it did not have any equity capital. From the time of its incorporation, Southern relied on Antrim-Tech Corporation (Antrim) and Durham for assistance. In 1971, Antrim as general contractors had a job in Gastonia, North Carolina, on which Southern was given a subcontract. On or about December 1, 1970, Durham allowed Southern to use rent-free eight *122 heavy concrete mixer trucks. Durham at this time had virtually stopped operations and therefore had no use for the equipment. There was no written agreement between the companies involving the use of the trucks. There was no obligation on Southern's part to purchase the trucks. However, Carter was the president of Durham and the person mainly responsible for the loan arrangement. He expected Southern to buy the trucks when it was able to do so. In addition the trucks, all of which were at least 6 years old, had been used extensively by Durham and therefore were in serious need of repairs at the time Southern began its operations. Because of Southern's inability to pay for repairs, Durham expended the funds necessary to place and keep the equipment in good running order. [2]
*123 Southern's first major job was at the nuclear power plant in Parr, South Carolina. Carter had tried to get this job for either Durham or Southern as early as 1969, and Southern obtained it in early 1973. Due to the lack of adequate initial capitalization, Southern had cash flow problems until it started receiving payments from this job in 1973. Southern used this contract as collateral in obtaining an $850,000 loan from the Bank of Virginia. In May of 1972, Carter finally found a purchaser, Consolidated Materials, Inc., an unrelated corporation, for Durham's plant and all operating assets except the heavy concrete mixer trucks loaned to Southern. The purchaser did not buy the trucks because of their run down condition. Of the total sales price of $375,000, Durham received $225,000 in cash at the time of sale, and the remaining $150,000 was evidenced by a promissory note which was paid on October 31 and November 21, 1972. Durham used all but approximately $72,000 of the initial $225,000 payment to satisfy the claims of its creditors. The company used approximately $14,000 of the remaining $72,000 during August and September of 1972 to redeem the stock of the non-Carter family *124 shareholders. During the period after the sale of its assets through the end of the calendar year 1972, Durham transferred approximately $119,000 in cash to Southern. During 1973, Durham transferred to Southern, $16,723.62. Of the 1972 transfers, $36,323.08 was repayment of a note due Southern. Durham showed $78,650 as a loan to Southern in its ledger accounts. However, neither Durham nor Southern reflected on their year-end balance sheets the transfers as obligations of Southern. The transfers were not evidenced by promissory notes; no interest was paid by Southern to Durham for the use of the money; and the money was never repaid. On its tax return for the fiscal year ended November 30, 1972, Durham claimed $40,000 of the payments made to Southern as deductions for management fees. Southern invoiced this amount to Durham. Durham claimed an additional management fee deduction of $15,000 on its tax return for the fiscal year ended November 30, 1973. In November of 1972, Durham transferred $85,000 to Antrim which it showed on its books as an account receivable. The loan was never repaid. In part, Durham loaned the money to repay Antrim for the help it had given Durham. *125 In late 1969 and early 1970, Durham used Antrim's land to store the heavy trucks which were subsequently loaned to Southern. Also, prior to Durham's asset sale to Consolidated Materials, Inc., in a maneuver intended to forestall a foreclosure by one of Durham's creditors, Antrim put up a bid of $37,000 for the assets. Carter was never a shareholder or executive of Antrim. Despite the aid given by Antrim and Durham, Southern sustained yearly operating losses as follows: October 31, 1971
[ 22,280.76)
October 31, 1972
( 26,531.30)
October 31, 1973
(138,612.58) In the early part of 1974, the Bank of Virginia foreclosed upon Southern's assets and sold them at public auction. Carter did not receive any proceeds from this sale. Neither Durham nor Southern ever paid formal dividends to its shareholders. Respondent determined that Durham's $40,000 and $15,000 payments to Southern made during the years 1972 and 1973, respectively, were constructive dividends to Carter. Also he determined section 6653(a) additions to tax of $2,264.37 for 1972 and $226.64 for 1973, as netted by an abated delinquency penalty previously assessed. OPINION Issue 1. Constructive *126 Dividend
Respondent argues that the $40,000 and $15,000 payments made in 1972 and 1973, respectively, which were labeled "management fees" by Durham and Southern, were constructive dividends to petitioners. His premise is that the payments were made either for nonbusiness purposes or primarily for Carter's benefit. Petitioners, on the other hand, argue that the payments were not constructive dividends but were payments made for the valid business purpose of reimbursing Southern for services provided by its employees to Durham during the period when Durham was attempting to sell its assets. Petitioners argue, in the alternative, that even if lacking this business purpose the payments did not constitute constructive dividends because (1) Carter owned less than a controlling interest in Southern and (2) Carter did not receive a direct, primary, financial benefit from the transfers. The issue is fundamentally factual. On consideration of all the evidence, we find that the transfers in 1972 and 1973 were constructive dividends to Carter.
Section 301 provides that a distribution of *127 "property" made by a corporation to a shareholder with respect to his stock, to the extent it is a dividend, shall be included in the shareholder's gross income. The term "property" is defined in section 317 to mean money, securities, and any other property except stock or stock rights in the distributing corporation. Section 316 defines "dividend" to mean any distribution of property made by a corporation to its shareholders out of earnings and profits accumulated after February 28, 1913, or out of current year earnings and profits.
A distribution by a corporation, not made directly to one of its own shareholders, may be a taxable dividend if it is made for the shareholder's benefit, either personally or in discharge of his personal obligation. Sammons v. Commissioner,472 F.2d 449, 451 (5th Cir. 1972), affg. on this issue a Memorandum Opinion of this Court; Dean v. Commissioner,57 T.C. 32, 40 (1971); Idol v. Commissioner,38 T.C. 444, 457-458 (1962), affd. 319 F.2d 647 (8th Cir. 1963). A taxable dividend may result where *128 no formal corporate action has been taken to declare the dividend, Paramount-Richards Theatres, Inc. v. Commissioner,153 F.2d 602, 604 (5th Cir. 1946), or where the corporate distribution does not equally benefit all the corporation's shareholders. Lengsfield v. Commissioner,241 F.2d 508, 511 (5th Cir. 1957), affg. a Memorandum Opinion of this Court; Dynamics Corporation of America v. United States,392 F.2d 241, 246 (Ct. Cl. 1968); see also Worcester v. Commissioner,370 F.2d 713, 715 (1st Cir. 1966), affg. on this issue a Memorandum Opinion of this Court; Sparks Nugget, Inc. v. Commissioner,458 F.2d 631, 638 (9th Cir. 1972), affg. a Memorandum Opinion of this Court.
Common ownership of the transferor and transferee corporations by itself is not enough to justify constructive dividend treatment. Joseph Lupowitz Sons, Inc. v. Commissioner,497 F.2d 862, 868 (3d Cir. 1974), affg. on this issue a Memorandum Opinion of this Court. Nor is it sufficient that the shareholders receive an indirect *129 or derivative benefit. Rushing v. Commissioner,52 T.C. 888, 894 (1969), affd. on other grounds 441 F.2d 593 (5th Cir. 1971); Edgar v. Commissioner,56 T.C. 717, 758 (1971). In some cases, it has been held that the transfer must have been made primarily for the shareholder's benefit, and he must have received a direct or tangible benefit therefrom. Rapid Electric Co. v. Commissioner,61 T.C. 232, 239 (1973); Kuper v. Commissioner,61 T.C. 624, 632 (1974). As detailed in our Findings, when Carter caused Durham to transfer funds to Southern in 1972 and 1973, Durham had not carried on any substantial operations for many months and was virtually a corporate shell. It had used cash received from the May 1972 asset sale to pay its debts and redeem the stock owned by non-Carter family members and had a substantial balance on hand for which it had no current need. At the time these transfers were made, Carter was attempting to establish Southern, formed on November 13, 1970, in the business of furnishing ready-mixed concrete to large construction projects. Carter was Southern's president and Olga S. Carter *130 was its secretary. Southern had practically no paid-in capital. For assistance in getting established, Southern had relied on Antrim, a corporation which had given it a subcontract, and on Durham, which had made eight trucks available for its use. These were the trucks not sold in the May 1972 sale. Southern was experiencing serious cash flow problems, and Durham's transfers of funds in 1972 and 1973 helped delay Southern's ultimate demise. Thus, Carter, the controlling shareholder of Durham, caused that corporation to transfer funds to Southern. Durham's transfers of funds to Southern were a direct benefit to Carter, the president and controlling force behind the struggling Southern, in his efforts to bail it out and use it as the vehicle to re-establish himself in the concrete business. The situation is in substance the same as if Durham first had distributed the funds to Carter and Carter had then invested them in Southern. We think the transfers were constructive dividends to Carter. A dividend does not escape taxation "simply because it fails to pass through the hands of the *131 particular taxpayer when * * * the dividend is diverted at the behest of the shareholder into hands of others." Sammons v. United States,433 F.2d 728, 730 (5th Cir. 1970). Unfortunately, Southern later failed, but its subsequent failure does not retroactively alter the character of the transfers when made. Petitioners first argue that the transferred funds were not a constructive dividend to Carter because Carter owned only one-third of the stock of Southern, the transferee. Assuming that Carter owned only one-third of Southern's stock, [3] he nonetheless dominated and controlled Durham and caused it to make the transfers to Southern. That is the crucial fact. It is true that in most cases, where intercorporate transfers have been held to constitute constructive dividends, one shareholder controlled both corporations. See, e.g., Worcester v. Commissioner,supra at 715; Sparks Nugget, Inc. v. Commissioner,supra at 638; Rapid Electric Co. v. Commissioner,supra at 239. However, as stated in Joseph Lupowitz *132 Sons,Inc. v. Commissioner,supra at 868, fn. 14,: "The 'constructive dividend' doctrine requires reference to the transferring corporation and not to the transferee." The shareholder's control of the paying corporation gives him power to direct the distribution of that corporation's funds. His exercise of such power, whether the distribution is to another corporation or an individual, primarily for the shareholder's benefit, stamps the transfer with the mark of a dividend. *133 Thus, in a variety of factual circumstances, the courts have held that a shareholder realized dividend income where he caused corporate funds or some other benefits to be conferred on others. In Hardin v. United States,461 F.2d 865, 872 (5th Cir. 1972), for example, where the dominant shareholder caused a corporation to make payments to his sister-in-law, the court said: Generally, "any distribution of property by a corporation to its shareholders out of accumulated earnings and profits is a dividend taxable to the shareholders as ordinary income." * * * Whether or not a dividend has been formally declared is irrelevant. * * * Likewise * * * "it is of little consequence that [Taxpayer] personally received no money from the transaction, for it is the power to dispose of income and the exercise of that power that determines whether taxable income has been received." * * * The fact that Mrs. Hardin [the sister-in-law] was not a shareholder of the corporation, and that the payments *134 were not made in satisfaction of a legal obligation, means nothing if their only purpose was to satisfy what Taxpayer obviously felt to be a personal or moral responsibility for his sister-in-law's welfare rather than a legitimate business purpose. See, also, Green v. United States,460 F.2d 412, 419 (5th Cir. 1972) (bargain sales to the shareholder's children). Carter undeniably had complete control of Durham, and he exercised that control to cause the distributions to be made to Southern. Clearly, he did so primarily for his own benefit and without any business purpose which served Durham's interests. We do not intend to suggest that, in the case of intercorporate transfers, the stock ownership of the transferee corporation is irrelevant.Such ownership is a consideration in the "search for intent or purpose * * * to differentiate between the normal business transactions of related corporations and those transactions designed primarily to benefit the stockowner." Sammons v. Commissioner,supra at 451. In the instant case, it is a relevant consideration *135 in deciding whether the transfer of funds, for example, was payment of "management fees" or a loan or had some other business purpose. Despite Carter's alleged ownership of only one-third of Southern's stock, the transfer was not a normal business transaction and, as discussed below, was neither a payment of management fees nor a loan. Petitioners' argument that Durham's 1972 and 1973 transfers of funds to Southern were made in payment of "management fees" is without merit. True, the payments were so labeled and deducted as expenses on Durham's income tax returns for those fiscal years, and petitioners maintain that the payments were intended to compensate Durham for its services in arranging the May 1972 sale of its assets and for the services of its clerical force and its mechanics. But the evidence will not fairly support a finding that the transfers were made for those purposes. The only real services performed for Durham in 1972 were Carter's efforts to sell its plant and operating assets. Carter, not Southern, carried out these efforts, and during Durham's fiscal year in which the sale was made, Durham paid Carter a salary for his services. True, Carter also received *136 a salary from Southern as its president during its fiscal years 1972 and 1973, but his salary amounted to only $9,400 in 1972 and $4,624 in 1973. Bearing in mind that Carter was devoting his time to Southern's concrete business operations, as well as Durham's sales efforts, it would stretch credulity to say that, even though Southern paid Carter these relatively small amounts, Southern through his sales services earned from Durham $40,000 in 1972 and $15,000 in 1973. We think Carter's efforts to sell Durham's plant and equipment were carried out by him individually as its principal shareholder, or as an employee of Durham, not as an employee of Southern. The claims that Durham provided Southern with any substantial services of stenographers and mechanics simply was not substantiated by credible evidence. Petitioners' next argument is that Durham advanced the $56,723.62 to Southern to establish it in the concrete business with the expectation that Southern eventually would buy its eight concrete mixer trucks. This theory might explain a temporary loan of the trucks or in ordinary circumstances a loan of money. However, the record does not show how much Durham could have expected *137 to receive for the trucks. Durham's financial statement as of November 30, 1973, shows its trucks cost $174,182 and that depreciation of $167,861 had accumulated against them, leaving a book value of only $6,321. They are described in the testimony as rundown and in need of repair. We think it incredible that Durham, dealing at arm's length, would have contributed, invested, or loaned $56,723.62 to Southern, whose financial position was shaky at best, hoping that corporation would eventually be able to buy the trucks. Nor does the record permit a finding that the transfers were loans. The key to ascertaining whether the transfers created a bona fide debt is the intent of the parties. Kaplan v. Commissioner,43 T.C. 580, 592-594 (1965). No notes or other evidence of indebtedness were signed. Although part of the 1972 transfers were listed on Durham's ledger as loans to Southern, they were not so treated by either corporation on its year-end balance sheets.No interest was charged by Durham or promised or paid by Southern. There is no evidence of any repayments to Durham *138 or any schedule of promised repayments. Nor would one dealing at arm's length be likely, in view of its poor financial condition, to make a loan of $55,000 to Southern. And as if to resolve any doubt, Durham deducted the amount of the transfers not as bad debts, but as "management fees" in the year the funds were transferred. We hold that the transfers made by Durham to Southern are constructive dividends to Carter. For 1972 Carter had dividend income of $40,000. Although the notice of deficiency for 1973 determined that only $15,000 was transferred from Durham to Southern, actual transfers amounted to $16,723.62. At trial it was agreed that, if constructive dividends were found, the amount thereof was $16,723.62. Issue 2. Section 6653(a) Addition to Tax
Respondent in his notice of deficiency determined section 6653(a) additions to tax against petitioners of $2,264.37 and $226.64 [4] for the years 1972 and 1973, respectively.That section provides that if any part of an underpayment is due to negligence or intentional disregard of the rules and regulations without intent *139 to defraud there will be added to the tax an amount equal to 5 percent of the underpayment. Respondent argued in his brief that petitioners disregarded the rules and regulations by applying the corporate funds transferred from Durham to Southern to their own benefit without including these payments in gross income. We think petitioners have carried their burden of proving that the imposition of the negligence penalty was erroneous. The failure of petitioners to include the money transferred between Durham and Southern as gross income was not due to negligence or intentional disregard of the rules and regulations. The issue as to whether these transfers were constructive dividends is a complex legal issue on which there can be an honest difference of opinion. Cf. Marcello v. Commissioner,43 T.C. 168, 182 (1964), affd. and remd. in part, 380 F.2d 509 (5th Cir. 1967); Bunnel v. Commissioner,50 T.C. 837, 843 (1968). Issue 3. Applicability of the Innocent Spouse Provision of Section *140 6013(e)
Petitioners in their brief argue that Olga S. Carter should be relieved under the provisions of section 6013(e) of the joint and several liability resulting from her filing a joint return with her husband, Carter, as provided in section 6013(d)(3).
Section 6013(e)(1) provides: (1) In general.-- * * * if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefitted directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other *141 spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. Petitioners argued that Olga S. Carter had no knowledge, nor did she have any reason to know, of any of the transfers made by Durham to Southern. In addition, it was argued that she did not receive any benefits from the transfers and in fact was hurt in her role as a shareholder of Durham by the resulting depletion of the corporation's capital.
A spouse seeking the relief of section 6013(e) has the burden of proving that she qualifies. Fox v. Commissioner,61 T.C. 704, 716 (1974). Olga Carter testified that she did not know that Durham's funds were transferred to Southern. Carter was the controlling force behind Durham and Southern, and they in effect were his businesses. Olga Carter even in her role as secretary of Southern had no reason to know of the transfers made between the corporations. Her position as secretary was basically a symbolic one. Her only duty *142 was signing stock certificates, and she testified she did that at her home rather than at the corporation's place of business. In addition, it cannot be said that Olga Carter benefitted significantly--directly or indirectly--from the transfers. She owned no stock in Southern. It therefore would be inequitable to hold her liable for the deficiencies. If Southern had ever turned the corner Mrs. Carter might have benefitted indirectly from the transfers in the sense that she might have shared in the income Carter would have earned. This, however, is not a significant benefit within the intendment of section 6013(e). In addition, as a shareholder in Durham, she was directly harmed by the transfers since Durham's capital was depleted and her stock was rendered virtually worthless. Olga Carter is therefore entitled to relief under section 6013(e).
To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue.↩
2. In its fiscal year ending Nov. 30, 1972, Durham made the following additional payments to Southern: Truck maintenance
$28,433.40
Truck fuel and lubricants
1,310.59
Repairs
20,441.05
$50,185.04 In its deficiency notice, respondent determined these payments were constructive dividend income to petitioners under secs. 301 and 316↩. Subsequent to trial, however, respondent conceded that these payments were not dividend income.
3. The facts on the stock ownership, however, are somewhat murky. It is true that Southern's stock records indicate that the stock was owned by Carter, James C. Hutchins, and David M. McConnell, 100 shares each, but we are not satisfied Hutchins and McConnell were the beneficial owners of the stock. None of the shareholders invested any money when they received their stock. Hutchins was nominee of William Paul Hutchins, to whom his 100 shares were transferred on Aug. 1, 1973, but these shares were transferred to Carter, apparently without any consideration, on June 5, 1974. David McConnell, the other shareholder deposited $60,000 in an escrow-type account for Southern's use, but the money could not be spent without his approval. The record contains no explanation of why the other two shareholders, Hutchins and McConnell, never paid in their stock subscriptions or why they were issued stock in the first instance.↩
4. The sec. 6653(a)↩ addition to tax for 1973 of $260.64 was netted against a $34 sec. 6651(a)(1) delinquency penalty which was abated.