JOHN W. KLUGE AND YOLANDA KLUGE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kluge v. Commissioner
Docket No. 5560-78.
United States Tax Court
T.C. Memo 1981-5; 1981 Tax Ct. Memo LEXIS 741; 41 T.C.M. (CCH) 690; T.C.M. (RIA) 81005; January 5, 1981
Thomas A. O'Neil, James R. Murphy, James E. Rodgers, and John C. Smuck, for the petitioners. Joyce H. Errecart, for the respondent. TIETJENS
MEMORANDUM FINDINGS OF FACT AND OPINION TIETJENS, Judge: Respondent determined a deficiency of $ 131,530 in petitioners' Federal income tax for 1974. [1] The issue for our determination is whether petitioner John W. Kluge received a dividend of $ 189,096 from his wholly owned corporation. *742 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated herein by reference. At the time they filed their petition, petitioner John W. Kluge resided in New Rochelle, New York and petitioner Yolanda Kluge resided in Beverly Hills, California. Petitioners timely filed a joint Federal income tax return for 1974. From 1957 to the present, petitioner John W. Kluge (hereinafter John or petitioner [2]) owned 100 percent of the outstanding stock in Tri-Suburgan Broadcasting Corporation (hereinafter Corporation), a Maryland corporation. At all times relevant, John was chairman of the board of directors and the Corporation's treasurer. He made all investment decisions for the Corporation. In addition, petitioner was a partner and sole proprietor, respectively, of two businesses, both of which are known as Kluge-Finkelstein & Company and was also a 50 percent owner and chief executive officer of Kluge-Finkelstein & Co., Inc., a Delaware corporation. These enterprises are all food brokerage businesses. The Corporation *743 is managed as a separate entity; its books and records are separate from petitioner's and its records and tax reports are maintained and serviced by professional personnel. From 1959, subsequent to the Corporation's sale of its radio station WGAY in Silver Spring, Maryland, the Corporation's offices have been located within Kluge-Finkelstein & Company (hereinafter K-F) offices. No specific office space is allocated to the Corporation, but the corporate books and records are kept there in a file cabinet. Between 1972 and April, 1975, these companies, and thereby the Corporation's, offices were located in inadequate office space in Columbia, Maryland. In April, 1975, K-F moved into new offices located in a newly-constructed building in Columbia, Maryland which it owned. The building and offices were locked at night and on weekends. There is no other security system for the K-F offices and the office building. [3]
Although interested in art for about 45 years, since 1959, petitioner has personally engaged in investing in various artworks. He selects *744 art purchases primarily for investment and, although he takes esthetics into account, chiefly regards art as a business. Petitioner's personal art transactions between September 13, 1974 and April, 1976 had a total value of $ 613,721 of which $ 382,731 were purchases, $ 155,540 were sales and a total value of $ 75,450 were charitable donations. Between 1959 and 1974, the Corporation's investments were limited to stocks, bonds, and real estate. In 1970, petitioner purchased land located in Loudoun County, virginia. On January 2, 1974, petitioner conveyed a tract of 36.067 acres of this land to the Corporation. On August 1, 1974, all of this land was sold to one purchaser. The Corporation received $ 232,121 or $ 249,575 [4] for the sale of its acreage. The portion of the tract sold by petitioner was reported on the installment basis. On September 12, 1974, petitioner executed *745 bills of sale for the 33 art objects which he had purchased between 1967 and 1974 for a total cost of $ 231,448, [5] and named the Corporation as the purchaser for the total consideration of $ 232,449. [6] On August 30, 1974, the Corporation paid a commission of $ 5,600 with respect to the purchase of art for petitioner to be sold to the Corporation. Six of the 33 artworks, with a total sales price allocated to them of $ 43,350, were not retained in petitioner's home and were not included as dividend income in respondent's notice of deficiency. The remaining 27 art items, with a total sales price of $ 183,496, were retained in petitioner's personal residence in New York until at least the spring of 1976. After that time, in 1976, 1 of the art objects was kept with an art dealer, 10 were located in the Kluge's Beverly Hills residence, 6 were located in K-F offices, 1 was sold, and 9 remained in petitioners' New York home. During part or all of 1977, *746 8 of the art objerts were located in K-F offices, 1 was on display at two art museums, and 10 were kept in petitioners' Beverly Hills home, and 7 remained in petitioners' New York home during all of 1977. During 1978, 1 of the artworks was retained in K-F offices, 4 were kept in petitioners' Beverly Hills home, 1 was sold, 1 was kept at an art dealer's until early 1978, and the remaining 19 were retained in petitioners' New York home. Petitioner's residence has an excellent security system and the house location itself is protected by a security guard. Some of the artwork was on display in his residence while other art objects were kept in the attic. The transaction was recorded in 1974 on the separate financial records in petitioner and the Corporation to reflect receipt and payment of the price, specifically, to show a decrease of petitioner's art collection asset from in excess of $ 400,000 to approximately $ 168,000 and a correlating increase in the Corporation's asset account to show the art investment of approximately $ 232,000. Since 1974, this art has been represented as the Corporation's art collection. As a result of this transaction, petitioner's 1974 Federal *747 income tax return included a gain of $ 998. On the Corporation's 1974 Federal income tax return, this transaction was reported as an acquired asset included in the year-end balance sheet and identified as artworks. Likewise, the Corporation's 1974 New York State (State) Franchise Tax Report and its 1974 New York City (City) tax return reflected the transaction as a purchase. In subsequent years, the Corporation's State and local tax returns were calculated with reference to its characterization of this transaction as an art purchase. The Corporation's taxes increased thereby; however, as additions to capital, as opposed to income, they were taxed on the State returns at the rate of.00178 for 1975-1978, and in the City returns at a rate of.0015 for 1975-1978. Additionally, the Corporation's total State taxes averaged approximately $ 675 for 1975 through 1978 and its City taxes averaged a total of approximately $ 444 for these years. The Corporation reported, from the sale of 4 art objects, gains of $ 1,088 and $ 4,249, respectively, in 1976 and 1977 and a loss of $ 4,555 in 1978 and paid all its income tax obligations arising from these transactions. Petitioner testified that *748 presently 3 of the 33 art objects have a value of more than $ 200,000. On its 1974 and 1975 Federal income tax returns, the Corporation described its business as investment in real estate and securities. On its 1976 Federal income tax return, the Corporation described its business as investment in real estate, securities, and artworks. During 1976, the Corporation purchased additional art objects for purchase prices totaling $ 40,919. All of this art is reflected on the books and records of the Corporation as purchased and paid for by the Corporation in the same manner the Corporation recorded its 1974 art transaction; in addition, all these objects have been retained in the Corporation art collection. During 1974 through 1978, the Corporation was a personal holding company and paid no dividends to petitioner. The last times it did pay a dividend were before 1959 and possibly one time after that date but before 1974. On December 31, 1974, the Corporation's accumulated earnings and profits exceeded $ 189,096. As of January 1, 1974, petitioner owed $ 192,694 to the Corporation. This indebtedness was reduced by $ 13,500 during 1974. The Corporation, also, owed petitioner *749 $ 211,880 during that year. The audit of petitioners' 1974 Federal income tax return was commenced during or before July, 1975. Petitioners' taxable income for 1974 was $ 389,937; any dividends in that year would therefore be taxable at the 70 percent rate. Petitioners assert that John did not receive a distribution under section 301. [7] They argue that the doctrine of constructive receipt is to be applied sparingly, that a corporate expenditure is not a constructive dividend unless it is made primarily for a shareholder's personal benefit and not for a valid corporate business purpose, that the tax value of constructive dividends is not measured by the cost of a corporate asset even if the asset is used by a shareholder, that the fact that a corporation's involvements parallel shareholder interests does not detract from the bona fides of the Corporation, that a derivative, incidental, or indirect benefit is not taxable as a constructive dividend, that the integrity of a normal sale transaction between a shareholder and a controlled corporation is not to be disregarded, and that legal doctrines preclude a finding of constructive dividend in this case. In addition, petitioners *750 maintain that the presumption of respondent's correctness is not applicable here; however, if arguendo this Court allows such a presumption, petitioners affirm they have rebutted that presumption. Respondent, by contrast, contends that, in 1974, John received a dividend of $ 189,096 within the meaning of sections 301 and 316. He argues that there was no sale of artworks to the Corporation in 1974 or that if there was a sale, that the sale was transitory and all benefits attributable to the art objects were intended to inure to petitioner. Respondent asserts that petitioners have misinterpreted his argument; he does not conend that petitioners received any "constructive" benefits, but that John actually received $ 189,096 in cash. Respondent, moreover, asserts that petitioners have the burden of proof to establish that John received sales proceeds, rather than a dividend, with respect to the $ 189,096 payment. We agree with the respondent. OPINION Petitioners bear the burden of proof in this proceeding. Welch v. Helvering, 290 U.S. 111 (1933); *751 Rule 142(a), Tax Court Rules of Practice and Procedure.[8]
Section 301 provides for the inclusion in a shareholder's gross income of that portion of a corporation's distribution of property to him or her which constitutes, under section 316, a dividend. Section 316 defines a dividend as any distribution of property from a corporation to a shareholder out of its earnings and profits accumulated after February 28, 1913. Section 317 defines property as money, securities and other property excluding stock in the corporation. The question of whether payments from a corporation *752 to a shareholder constitute a dividend is a factual issue and depends upon the intent of the parties at the time of the payments. Dean v. Commissioner, 57 T.C. 32 (1971). Substance, rather than the form of a transaction, is controlling for Federal income tax purposes. Gregory v. Helvering, 293 U.S. 465 (1935). Whether or not legal title to the art objects passed to the Corporation on September 12, 1974 is not conclusive. Higgins v. Smith, 308 U.S. 473 (1940). Technical indicia of ownership are not determinative. Doyle v. Mitchell Brothers Co., 247 U.S. 179 (1918). Transactions between shareholders and their closely-held corporations, moreover, should be carefully scrutinized. Baird v. Commissioner, 25 T.C. 387 (1955). If a distribution by a corporation to its shareholder is made for the personal benefit of the shareholder rather than for a valid business purpose, the law is clear that such disbursement may be found to be a dividend. Rapid Electric Co. v. Commissioner, 61 T.C. 232 (1973); Rushing v. Commissioner, 52 T.C. 888 (1969), affd. 441 F.2d 593 (5th Cir. 1971). *753 Among the facts which petitioners contend show the valid business purpose of the 1974 art transaction are the superior care and safeguarding system in petitioners' residence, the opportunities for display and exposure to curators, the Corporation's lack of office space facilities, the appreciation in value of the artwork, John's personal interest and expertise in art primarily for investment purposes, the Corporation's management as a separate entity from John and specifically its separate books and records, its purchase of additional artwork in later years, the formal indications of a sale including the Corporation's execution of bills of sale and the characterization as a sale in the Corporation's Federal, State, and Local tax returns, and the increase in taxes due. By contrast, the facts which respondent asserts indicate the transaction's intent to effect a personal benefit for petitioner include the Corpoation's investments prior to 1974 being limited to stocks, bonds, and real estate, John's making all business and investment decisions of the Corporation, the Corporation's failure to pay dividends to petitioner between 1974 and 1978, the fact that dividends to petitioners *754 would be taxable at 70 percent rates, the Corporation's recent sale of a piece of real estate and its distribution of cash to petitioner of an almost like amount of cash purportedly for the artwork, the "sale" of art by petitioner to the Corpoation for a small amount in excess of his basis, the fact that although in 1974 petitioner owed $ 192,694 to the Corporation, he was given the alleged sales proceeds in cash rather than as a cancellation of his indebtedness, the small increase in State and local taxes paid by the Corporation due to the alleged sale, and the Corporation's accumulated earnings and profits at the end of 1974 exceeding $ 189,096. Respondent emphasizes that for almost two years subsequent to this transaction, all of the art objects remained in his home, that only in 1976, after the audit of petitioners' return was commenced, did petitioner move any art objects from his home [9] and did the Corporation make additional investments in art for purchase prices totaling approximately $ 41,000. Moreover, he underlines that despite testimony that art is a profitable investment, the Corporation in 1976, 1977, and 1978, has merely realized a net gain of $ 782. Similarly, while *755 petitioner contends that art needs breathing space and, to be salable, the ability to be on display, he kept some of the art objects in the attic of his home; also, despite its relative lack of security, after the audit of petitioners' 1974 return, some of the art collection was moved to K-F's offices. Weighing these relative contentions, we conclude that the primary benefit of the 1974 transaction was a personal one to petitioner and that the transaction constitutes a dividend to him. The case most parallel to the instant one is Proskauer v. Commissioner, T.C. Memo. 1971-174. In Proskauer, the taxpayer wife purchased a piece of sculpture with funds from the taxpayers' wholly owned corporation. The sculpture was delivered directly to their home and remained there. Although the taxpayers had a substantial art collection in their home, the corporation never later acquired any other art. The corporation's books and records as well as its tax returns specifically showed the sculpture as an investment of the corporation. In holding that the taxpayers received a dividend *756 of the cost of the sculpture, we emphasized that, despite the presence of the technical indicia of ownership, the sculpture remained in the taxpayers' home, the corporation never exercised dominion over the art, did not charge petitioners for its use, did not insure it until after the case commenced and never invested in other artwork. Similarly, here, we are convinced that petitioners retained the beneficial use of the art purportedly sold to John's wholly owned corporation. Additionally, petitioners received, in cash, $ 189,096. Although some of the artwork was relocated two years after the transaction, most of the art remained in either petitioners' New York or Beverly Hills homes even then. In addition, the movement of the art occurred only after the beginning of respondent's audit; furthermore, their movement, mostly to K-F offices, tends to undermine petitioners' argument that petitioner kept the art in his home and not in K-F offices because of his home's superior safeguards and space for display. The Corporation's later purchase of artwork, to the extent of approximately $ 41,000, similarly, occurred after the commencement of the audit of petitioners' 1974 return. While *757 the additional art investments differentiate this case to some degree from Proskauer, the other factors clearly lead us to the same result. [10]
Accordingly, we find that petitioner received, from the Corporation, a dividend in 1974 in the amount of $ 189,096. [11]
Decision will be entered for the respondent. Footnotes
1. Respondent mailed a timely statutory notice of deficiency in income tax for 1974 to petitioners on March 3, 1978.↩
2. Yolanda Kluge is a party to this case solely by her joinder in the joint tax return.↩
3. A separate security system existed for the bank located on the first floor of the office building from 1976 to the present.↩
4. The lower figure is the amount which may be computed using the figures appearing on the Corporation's statement in lieu of Schedule A of Schedule PH, pp. 12-13; the higher figure is the gross selling price figure which appears on the Corporation's Supplemental Schedule of Gains and Losses for 1974.↩
5. These objects represented between 40 percent and 50 percent of petitioner's them existing personal art collection. ↩
6. According to petitioner's testimony, this price was probably less than the actual value of the artwork.↩
7. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue, unless otherwise stated.↩
8. Petitioners' contention that this case falls within the purview of United States v. Janis, 428 U.S. 433 (1976) is meritless; respondent has not, as petitioners suggest, made a naked assessment without foundation. Nor do petitioners have a lesser burden of proof, under Taylor v. Commissioner, 70 F.2d 619↩ (2d Cir. 1934), because, as they assert, they must prove a negative. Although proving the payments John received did not constitute a dividend is in a sense proving a negative, stated differently, petitioners must prove the payment represented bona fide sales proceeds.
9. Even then, most of the art remained in either his New York or Beverly Hills homes.↩
10. There is nothing in the record, however, regarding insurance coverage on the art objects.↩
11. In making this determination, we have considered petitioners' argument that should we find a dividend, we must value the dividend at less than the cost of the artwork. Presumably, petitioners wish us to calculate the dividend at the rental value of the artwork; yet, petitioners have presented no evidence about this value. Although we recognize the difficulty in providing such evidence, because petitioners have the burden of proof, we must conclude that respondent's determination regarding the value of the dividend is correct.↩